## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:17-cv-351**

**THERMAL SPACE, LTD.**

### PLAINTIFF

    **v.**

**TECHNOLOGY APPLICATIONS, INC.,**
**a Colorado Corporation;**
**TAI, INC., a Colorado Corporation;**
**BRIAN SPERRY, in his Individual Capacity**
**and as CEO and President of Technology**
**Applications, Inc. and TAI, Inc.; and**
**JEFFREY TYLER LINK, in his Individual**
**Capacity and as Director of Business Development**
**for Technology Applications, Inc. and TAI, Inc.,**

### DEFENDANTS.

---

### COMPLAINT

---

Plaintiff Thermal Space, Ltd., by its attorneys, files this complaint against Defendants

Technology Applications, Inc., TAI, Inc., Brian Sperry, and Jeffrey Tyler Link, for violations of

the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., Deceptive Practices under Colo. Rev. Stat. § 6-1-

105; Common Law Defamation; and Common Law Trademark Infringement.  In support thereof,

Plaintiff states as follows:

### NATURE OF THE ACTION

1.      In this action, Plaintiff Thermal Space seeks injunctive and monetary relief for the

unlawful acts of Defendants.  After the only two experienced engineers at Defendant Technology

Applications, Inc. ("TAI") left to form a competing company in 2015, TAI sought to ensure that Thermal Space would never gain traction in the industry by embarking on a number of acts that greatly harmed Thermal Space.  These include a coordinated false advertising campaign, the defamation of Thermal Space, a fraudulent clicking scheme, and trademark infringement, as set forth below.

## JURISDICTION AND VENUE

2.      This action arises under 15 U.S.C. §§ 1114(1) and 1125(a) and the statutory and common laws of the State of Colorado.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.  The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367, as well as under general principles of supplemental and pendant jurisdiction, in that the claims are joined with substantial and related claims under the laws of the United States.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the parties are all residents of this District and the events giving rise to the claims alleged herein occurred in this District.

## PARTIES

4.      Plaintiff Thermal Space, Ltd. is a Colorado Limited Liability corporation with its principle place of business located in Boulder, Colorado.

5.      Defendant TAI, Inc. is a Colorado corporation with its principle place of business in Boulder, Colorado.

6.      Defendant Technology Applications, Inc. is also Colorado corporation with its principle place of business in Boulder, Colorado.

7.      Defendant Brian Sperry is the President and CEO of Technology Applications, Inc. and TAI, Inc.  He is a resident of Boulder, Colorado.

8.      Defendant Jeffrey Tyler Link is the Director of Business for Technology Applications, Inc. and TAI, Inc.  He is a resident of Erie, Colorado.

## STATEMENT OF FACTS

9.      Thermal Space, TAI, and TAI, Inc. are all manufacturers of thermal straps.  A thermal strap (also known as a flexible thermal link, heat strap, or thermal shunt) is a device that is used to move heat between two or more locations through thermal conduction.  A thermal strap typically consist of rigid end fittings connected by one or more sections of flexible materials with high-thermal conductivity.  They are commonly used in the aerospace and defense industries, and at universities and research laboratories.

10.      Stephen Nieczkoski and Edward Myers, the co-founders of Thermal Space, are both highly trained engineers with decades of experience.

11.      Nieczkoski received his Bachelor of Science in Chemical Engineering and Petroleum Refining from the Colorado School of Mines in 1986.  He thereafter spent decades working in the field of heat transfer, thermodynamics, and cryogenics and has published numerous papers on these subjects.

12.      Nieczkoski began working for TAI in 1999 as a senior engineer.  At the time of his departure from TAI in 2015, he was the Chief Technologist.

13.      Myers received his Bachelor of Science in Engineering Physics from University of Colorado.  He thereafter graduated from the US Navy Nuclear Power School and Prototype Training Program, qualifying him to serve as Engineering Officer of the Watch on an operational nuclear prototype power plant.  He then received his Master of Science in Mechanical Engineering from the University of Colorado.  Like Nieczkoski, he has extensive work experience in heat transfer and cryogenics and has also published multiple papers on the subject.

14.     Myers began working for TAI as a junior design engineer in 1998.  At the time of his departure from TAI in 2015, he was the Chief Mechanical Engineer.

15.     In 2009, after Nieczkoski and Myers had been working at TAI for over a decade, the company was purchased by Defendant Brian Sperry.  After he purchased TAI, Sperry also set up a second company, TAI, Inc.

16.     Sperry also set about populating TAI with his relatives, none of whom had a college degree or any experience in a technology company and, more specifically, any experience in the thermal strap industry.  The workplace environment began to deteriorate.  By 2014, the only engineers left on staff were Nieczkoski and Myers, and the only other employee left on staff who was not a relative of Sperry was Defendant Link.  He was a close family friend who did marketing for TAI.

17.     In 2014, frustrated with the lack of professionalism that permeated TAI, as well as the nearly constant late payroll and the company's failure to deposit his deferral 401(k) contributions into his individual 401(k) retirement account (and instead spending that money on the company), Nieczkoski began voicing his concerns with the company.  He continued to do so, and in the spring of 2015, Nieczkoski was terminated from TAI.  Myers resigned his position soon after.  TAI was thus left with no experienced engineers.  All but one employee was related to Sperry.

18.     Nieczkoski and Myers formed Thermal Space in June 2015.  Thermal Space offers technology consultation, research, and systems development in the field of aerospace thermal management and cryogenics engineering.  Thermals Space also offers its customers thermal management hardware solutions, from thermal straps and heat exchangers to complex, state-of-the-art cryostats and custom cryogenic cooling systems.

19.     Like TAI, Thermal Space's customers are the Department of Defense, scientific institutions, aeronautics organizations and companies, space and manufacturing companies, and one of its product offerings is custom thermal straps.  Unlike TAI, Thermal Space has engineering expertise to design and support the applications of its products.

20.     TAI was in a bind, since it had lost its only experienced engineers, and now feared competition from a company that had experience and expertise that it could not match.  At this time, none of the employees that remained at TAI had any technical background or college degrees, with the exception of Sperry's niece, who was just about to graduate college.

21.     TAI thus set out to ensure that Thermal Space would never gain traction in the industry by (1) forcing the fledgling company to spend money, including to defend a frivolous lawsuit and, as relevant here, by paying inflated charges for Google AdWords; and (2) launching a false advertising and defamation campaign.

22.     The false advertising campaign consisted of false and misleading representations regarding TAI's capacities and capabilities, in order to give the misleading impression that its products are made in-house by highly trained expert engineers, while painting Thermal Space as a fraudulent, illegitimate supplier of thermal straps.

23.     The campaign was devised and directed by President and CEO Sperry and Link, who only two months prior had been promoted by Sperry to Director of Business Development. Link implemented the campaign, and Sperry oversaw and approved Link's work.

24.     TAI carried out its false advertising campaign on its website at www.techapps.com and other online sites, such as www.youtube.com.  On information and belief, TAI also makes these false and misleading statements in customer marketing materials as well.

25.     The TAI website is false and misleading in that it states and implies that (1) TAI does not need to outsource its thermal straps to outside machine shops; (2) TAI's straps are made by highly trained expert engineers and fabrication experts with many years' experience in the field; and (3) TAI's "two-person" competitor (Thermal Space) is a "fraudulent supplier" of thermal straps and makes "fraudulent" misrepresentations to its customers regarding its size and capabilities.

26.     For example, TAI states the following on its website:

> Our thermal strap products have flight heritage, and our team of experts have years of thermal strap design, fabrication, and qualification experience, and *extensive* experience with space flight programs (and the associated qualification and reporting requirements). Unlike some competitors, all of our strap products are assembled right here *at our facility, by our experts,* and TAI never outsources or uses counterfeit straps.

> ***

> **Who (Actually) Makes Your Straps Matters...**

> It's important you know who actually makes your strap hardware. At TAI, all of our copper, graphite, graphene, PGS, and carbon fiber composite straps are assembled right here in our facility, by highly trained experts with years of strap assembly and qualification experience.
> Unlike some of our competitors, we do not outsource your straps to other suppliers, machine shops, or poor quality, electrical component manufacturers in the US or China. When your program is on the line, it's important to ensure your thermal strap supplier is a legitimate company with a team of engineering *and* fabrication experts. It's also important to know that their thermal straps have flight heritage with the world's top aerospace organizations. Your program is too important to trust to one and two-person organizations, misrepresenting their size and production capabilities.

> From Design and Thermal Engineers, to a Program Manager, Production Manager, Quality Engineer, and numerous Fabrication & Test Technicians, TAI's team is ready to help!

> ***

6

**BEWARE OF FRAUDULENT SUPPLIERS**
**Unlike some of our competitors, TAI actually makes the straps we sell**.
All of our thermal strap products are assembled right here at our facility---by
several, highly-trained thermal strap fabrication experts---in our assembly
labs and clean rooms. We will never outsource your thermal straps to
electrical component manufacturers in the US, India or China (yes, other
suppliers do this routinely), nor will we ever outsource to other strap
suppliers, or local machine shops using contract laborers (many of our
customers have been the direct victims of these "suppliers," and have moved
to outsource entirely from TAI as a result---from national labs to aerospace
primes).

<u>Most Importantly</u>: Unlike the few remaining copper strap suppliers, TAI
never outsources to Chinese manufacturers, other strap suppliers, or local
machine shops (and their unskilled, contract laborers). Companies that
outsource straps not only endanger your program, but their straps
consistently present serious quality issues that inevitably lead to rejected
parts (due to bolt pattern, flatness, and other dimensional tolerance issues
and/or damage to straps). Our best customers, from Lockheed, to NASA,
or the National Labs (and many others), have all fallen victim to these
suppliers, and this is why they choose TAI--time and again--above all others.


**DON'T RISK USING OUTSOURCED OR COUNTERFEIT**
**SUPPLIERS**
**Unlike some strap suppliers, TAI will NEVER outsource your copper**
**straps (*or any thermal straps*), to machine shops, other strap suppliers, or**
**Chinese electrical component manufacturers. ALL straps are assembled**
**right here, *at Our Facility*, *by Our Experts*, to ensure you get the highest**
**quality thermal strap. If for any reason, we cannot manufacture your**
**strap, we are happy to recommend a reputable supplier (one that does**
**not make fraudulent claims about their staff, facilities, and capabilities,**
**and that has space flight heritage).**

\*\*\*

Do You Outsource Your Straps Like Other Suppliers?
Unlike some competitors, we do not outsource your thermal straps to other
companies or machine shops here in the US, or abroad. At TAI, all of our
strap products are assembled right here at our facility, by our experts.
As absurd as it may sound, TAI has direct evidence of (and has heard
customer's secondhand accounts of), competitors not only outsourcing their
copper straps from machine shops and Alibaba, but also using stolen TAI
thermal strap images and designs on their websites and in the sales process
(legal action has been taken against these "thermal strap suppliers").

\*\*\*

Your hardware---your program---is too critical to be trusted to 1 & 2 person organizations misrepresenting themselves as legitimate thermal strap suppliers, or Indian or Chinese-made, poor quality counterfeits.

\*\*\*

**WARNING SIGNS YOU MAY BE DEALING WITH AN "OUTSOURCED" OR "COUNTERFEIT" THERMAL STRAP SUPPLIER:**
**They do not have the necessary (*or any*) strap fabrication facilities.** This is the most obvious red flag during a customer visit. Understand that some companies claim they manufacture their own straps (among other products, such as cold plates or heat pipes), but they are *known* and *documented* outsourced suppliers, as they use machine shops (and 3rd party, unskilled contract laborers), to fabricate their products entirely, or they simply purchase products from poor quality, Asian suppliers. **There are only a few genuine strap suppliers in the world, and if TAI cannot manufacture a particular strap for you (due to your material or performance requirements), we are happy to refer you to a reputable supplier (one that has flight heritage and does not make fraudulent claims about their staff, facilities, or manufacturing capabilities).**

The company only has 1 or 2 *actual* employees (**don't be fooled by a phony, non-existent, and unreachable "Advisory Staff," "Executive Council," or stock images of groups of employees---these are deliberate attempts to misrepresent a company's true size and capabilities**).

27.     TAI, Inc. also advertises thermal straps, and its online tagline falsely implies that its thermal straps are not outsourced: "Outsourced Strap Suppliers Risk Your Program & Reputation."  When potential customers then click on www.tai-inc.com, they are directed to click on the website of TAI, Inc.'s "sister company," TAI.

28.     In reality, TAI (and TAI Inc., which has no employees beyond those at TAI itself) is utterly dependent on outside machine shops for the fabrication of its thermal straps.  TAI's employees do not have the skills or experience to build thermal straps on their own.  Outside machine shops are responsible for manufacturing every component of TAI's copper thermal

straps, as well as the final machining of the straps, and in some instances every step of the strap build is outsourced—component manufacture, assembling, and final machining, are all handled by outside machine shops.

29.     TAI's statements touting their "highly trained experts," who have "years of design, fabrication and qualification experience" are likewise false.  The TAI individuals involved in design and manufacturing TAI's thermal straps (or parts thereof, as the case may be) are Trevor Sperry, Rachel Sperry, Jamie Deal, David Dyke, and Samantha Erwin.

30.     Trevor Sperry is TAI's Manufacturing Manager.  He is Brian Sperry's son. After he graduated high school in 2003, he went to work for his father as an assistant doing clerical office work.  After five or so years, he started working on his family's livestock ranch before coming to TAI in 2010 after his father purchased the company.  He had no prior experience in the thermal science or in any technology field.

31.     Rachel Sperry is an Assembler at TAI.  She is Brian Sperry's daughter-in-law. She has a high school degree and had no prior experience in thermal science or in any technology field.

32.     Samantha Erwin is an Assembler at TAI.  She is an in-law of Brian Sperry.  She has a high school degree and had no prior experience in thermal science or in any technology field.

33.     Jamie Deal is the only person involved in strap fabrication and design that has a college degree.  On information and belief, she received that degree in May 2015.  She does not have any prior work experience as a thermal or quality engineer.  She is the Quality Manager at TAI and is Brian Sperry's niece.

34.     The only individual involved in thermal strap manufacturing who is not a Sperry family member is David Dyke.  David Dyke is TAI's Design Engineer.  He has no accredited engineering degree.

35.     None of these individuals are "highly trained."  In fact, the training that each of them has received is minimal to nonexistent.   None of these individuals are "expert" engineers, manufacturers, quality manager, or technologists.  The only one who has received any education in the technical field is Jamie Deal, and she graduated from college less than two years ago.

36.     TAI's false statements regarding outsourcing and the expertise of its engineering team were compounded by the false, misleading and defamatory statements it made regarding Thermal Space.  Although Thermal Space is never mentioned by name, the implied meaning of TAI's statements are clear, as the thermal strap industry is a small one.  Thermal Space is the only "two person" company, and the only one that has an Advisory staff.

37.     TAI's false, misleading and defamatory statements about Thermal Space include a warning that Thermal Space's Advisory Staff was "phony, non-existent and unreachable" and a "deliberate attempt to misrepresent" the size and capabilities of Thermal Space; that Thermal Space makes "fraudulent claims" about their staff, facilities and capabilities; that Thermal Space is misrepresenting itself as a "legitimate thermal strap supplier"; and that Thermal Space stole TAI's thermal strap images and designs.

38.     TAI, at the direction of Sperry and Link, also devised a Google AdWords campaign to mimic the AdWords campaign of Thermal Space.  TAI had no AdWords campaign until Thermal Space began using AdWords.  Whenever Thermal Space specified AdWords search phrases and taglines, TAI would do the same.  This is true even where the AdWords phrases

related to capabilities and services that TAI cannot offer, such as "thermal management expertise" and "no one has more experience."

39.     TAI also engaged in a fraudulent click campaign against Thermal Space.  This consisted of excessively clicking on Thermal Space's Google AdWords.  Thermal Space had paid for this advertising through Google AdWords on a cost per click basis.  When TAI excessively clicked on the Thermal Space website link through AdWords, Thermal Space had to pay for those clicks, and the quality of its ads were diminished and ranked lower because of the fraudulent clicks.  In a number of instances, the Thermal Space ads disappeared entirely from AdWords because Thermal Space's daily ad budgets had been reached through TAI's fraudulent clicking.  This fraudulent clicking was done with the intent to prevent Thermal Space Ads from being in a favorable position in Google key-word searches, to prevent Thermal Space from getting name recognition through internet marketing of its thermal strap products, and to force Thermal Space to needlessly spend money.

40.     To combat the fraudulent clicking, Thermal Space had to block its ads from the Denver area, since this is where TAI is located and where the fraudulent clicks were initially coming from, and also had to engage in a third party service to monitor for fraudulent clicking.

41.     Link admitted that multiple people at TAI would click on Thermal Space's AdWords multiple times a day, and also previously bragged about employing this fraudulent clicking strategy with another competitor.  After Thermal Space began blocking its AdWords in the Denver area, TAI used a Virtual Private Network scheme as a workaround, and continued excessively clicking on Thermal Space's AdWords.

42.      In addition to the false advertising and fraudulent clicking campaigns, TAI, Inc. also misappropriated the THERMAL SPACE® mark as the logo for TAI, Inc., which Link devised.

43.      On April 1, 2016, Thermal Space filed for the service mark THERMAL SPACE® The mark includes the design of a ringed planet. The first use in commerce was February 25, 2016.  The mark, as set forth below, was registered on November 16, 2016, Reg. No. 86961508. Thermal Space has developed substantial goodwill in association with its mark.



44.      After Thermal Space began its mark in commerce, TAI, Inc., at the direction of Link, who was the Director of Business Development, copied and imitated Thermal Space's mark by using a depiction of a ringed planet as TAI, Inc.'s own logo, as found on www.tai-inc.us.  Link admitted as much, saying that he liked Thermal Space's idea.

45.      This was all done to confuse customers into thinking that TAI still had its expert engineers, and even imply that Thermal Space was affiliated with TAI.  Compounding this confusion, TAI intentionally kept the TAI email accounts for Nieczkoski and Myers active, so customers would think that they were still employed with TAI.  TAI also kept Nieczkoski's and Myers' phone extension voice mail messages in place.

**COUNT I**
**AGAINST ALL DEFENDANTS: LANHAM ACT**
**FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)**

46.      Thermal Space re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

47.     Thermal Space is a competitor of TAI and TAI, Inc.

48.     Defendants made false and misleading statements of fact in commercial advertising regarding their own companies' capabilities and Thermal Space's capabilities, including that TAI and TAI, Inc. do not outsource their thermal straps; TAI's team is comprised of highly trained, expert engineers; and Thermal Space is a fraudulent supplier of thermal straps.

49.     These misrepresentations are material, in that they are likely to influence purchasing decisions.  Indeed, Link attributes part of TAI's success to the statements made on TAI's website, and notes that its website is where customers first find TAI.

50.     The misrepresentations have a tendency to deceive or actually deceive a substantial segment of Thermal Space's and TAI's audience.

51.     By advertising online, Defendants placed the false and misleading statements in interstate commerce.

52.     Thermal Space has been injured, and is likely to be further injured, as a result of the false statements.

53.     The conduct of Defendants was willful, wanton and deliberate.

## COUNT II
### AGAINST ALL DEFENDANTS:
### DECEPTIVE TRADE PRACTICES
### IN VIOLATION OF C.R.S. § 6-1-105 (FALSE ADVERTISING)

54.     Thermal Space re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

55.     Defendants engaged in unfair and deceptive trade practices by making false and misleading statements in advertising, as set forth *supra*.

56.     These false and misleading statements significantly impacts the public as actual or potential customers of Thermal Space's goods, in that the advertisements were widely seen online by potential customers.

57.     These false and misleading statements caused Thermal Space to suffer injury in fact to a legally protected interest.

58.     The conduct of Defendants was willful, wanton and deliberate.

**COUNT III**
**AGAINST ALL DEFENDANTS:**
**DEFAMATION UNDER COMMON LAW**

59.     Defendants made false and defamatory statements of fact regarding Thermal Space, including that it was a "fraudulent" supplier of straps who "deliberately attempted to misrepresent" its size and capabilities and that Thermal Space stole TAI's thermal strap images and designs.

60.     These statements were published to third parties via online statements.

61.     Defendants made these false and defamatory statements intentionally and maliciously, and at a minimum, with negligent disregard.

62.     Defendants' false and defamatory statements constitute defamation *per se* because the statements accuse Thermal Space of professional misconduct.

63.     Thermal Space was materially harmed, in that it suffered and continues to suffer economic losses in the form of loss earnings and future lost earning capacity, as well as damage to reputation.

64.     The conduct of Defendants was willful, wanton and deliberate.

## COUNT IV
### AGAINST ALL DEFENDANTS:
### COLORADO DECEPTIVE TRADE PRACTICES
### IN VIOLATION OF C.R.S. § 6-1-105 (FRAUDULENT CLICKING)

65.     Thermal Space re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

66.     Defendants engaged in deceptive trade practices by excessively clicking on Thermal Space's Google AdWords, in order to cause Thermal Space monetary harm and reduce Thermal Space's online visibility, as set forth *supra*.

67.     Defendants' fraudulent clicking occurred in the course of Defendants' business.

68.     These acts significantly impact the public as actual or potential customers of Thermal Space's goods, in that Defendants' conduct lowered the visibility of Thermal Space's online advertisements, and in some instances prevented Thermal Space's advertisements from being seen altogether by consumers online.

69.     Defendants' conduct caused Thermal Space to suffer injury in fact to a legally protected interest.

70.     Defendants' conduct was willful, wanton and deliberate.

## COUNT V
### AGAINST TAI, INC. AND LINK:
### LANHAM ACT INFRINGEMENT
### OF REGISTERED TRADEMARK UNDER 15 U.S.C. § 1114(1)

71.     Thermal Space re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

72.     TAI. Inc.'s depiction of a ringed planet in its logo constitutes a willful and knowing attempt to colorably imitate and trade on the goodwill which Thermal Space owns and has developed in the THERMAL SPACE® mark.

73.     Defendants' conduct is likely to cause confusion, or to cause mistake, or to deceive the purchasing public and others, leading them to mistakenly believe that TAI, Inc.'s goods and services are authorized by Thermal Space or that Thermal Space's goods and services are authorized by TAI, Inc.

74.     Defendants' conduct is likely to cause confusion, or to cause mistake, or to deceive the purchasing public and others, leading them to mistakenly believe that Defendants' goods are those of Thermal Space, or vice versa, in violation of 15 U.S.C. § 1114(1).

75.     Defendants' conduct has caused and, unless restrained and enjoined by this Court, will continue to cause irreparable harm, damage, and injury to Thermal Space.

## COUNT VI
## AGAINST TAI, INC. AND LINK:
## TRADEMARK INFRINGEMENT UNDER COMMON LAW

76.     Thermal Space re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

77.     Defendants' conduct as alleged herein is likely to cause confusion, or to cause mistake, or to deceive the purchasing public and others, whereby they would be led to mistakenly believe that TAI, Inc. is affiliated with, related to, sponsored by, or connected with Thermal Space, in violation of the common law of the state of Colorado.

78.     Defendants' conduct is likely to confuse and deceive members of the purchasing public as to the source of Thermal Space's goods as a result of Defendants' use of the infringing THERMAL SPACE® mark in association with a competing business offering similar products.

79.     Defendants' conduct also constitutes intentional, willful, and reckless disregard of Thermal Space's rights and an attempt to trade on the goodwill which Thermal Space has developed, all to the damage of Thermal Space.

80.     As a result of Defendants' conduct, Defendant has caused and, unless restrained and enjoined by this Court, will continue to cause irreparable harm, damage, and injury to Thermal Space.

81.     Thermal Space has no adequate remedy at law.

## COUNT VII
## AGAINST TAI, INC. AND LINK:
## LANHAM ACT TRADEMARK INFRINGEMENT
## UNDER 15 U.S.C. § 1125(a)

82.     Thermal Space re-alleges and incorporates the preceding paragraphs as though fully set forth herein.

83.     Defendants' conduct as alleged herein is likely to cause confusion, mistake, or deception as to origin, sponsorship, or approval of its goods sold and services provided under the infringing THERMAL SPACE® mark, and create consumer confusion as to the source of such goods and services, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

84.     Defendants' conduct constitutes a willful and knowing attempt to trade on the goodwill which Thermal Space has developed in its THERMAL SPACE® mark, and violates Thermal Space's trademark rights in its THERMAL SPACE® mark.

85.     As a result of Defendants' conduct, Defendants have caused Thermal Space irreparable harm and injury and will continue to do so unless Defendants are restrained and enjoined by this Court from further violation of Thermal Space's rights.

86.     Thermal Space has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Thermal Space prays that judgment be entered in its favor and against Defendants, as follows:

1.      A permanent injunction enjoining and restraining Defendants, their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them perpetually from:

      a.      falsely advertising as set forth *supra*;

      b.      fraudulent clicking on Thermal Space's website; and

      c.      misappropriating the THERMAL SPACE® mark;

2.      An award to Thermal Space of monetary relief, including, but not limited to, actual damages, compensatory damages, punitive damages, and restitution, as permitted by law in amounts to be determined at trial;

3.      An award to Thermal Space of prejudgment and post-judgment interest;

4.      An award to Thermal Space for its costs of suit, expenses and reasonable attorney's fees, as permitted by law; and

5.      Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Thermal Space hereby demands a jury trial on all claims and issues triable to a jury.

Dated:  February 8, 2017

                                  Respectfully submitted,

                                  s/  Bryna J. Dahlin
                                  Bryna J. Dahlin
                                  ROLLMAN & DAHLIN LLP
                                  77 W. Washington St., Suite 800
                                  Chicago, IL 60602
                                  Telephone: 312.286.4628
                                  E-mail: bryna@rollmandahlin.com

                                  Attorney for Plaintiff Thermal Space, Ltd.
                                  2450 Central Ave., Suite B-1
                                  Boulder, CO 80301